## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CHRISTOPHER GIBSON,

     Plaintiff,

v.

CITY OF WARREN; STEVEN
HODGES, BRENDEN FRASER,
DANIEL BRADLEY, JEFFREY
MOTYKA, MARK SMITH, THOMAS
SCHMELZER, ANTHONY GIANNOLA,
ADAM DICKIE, DAVID VILLEROT,
JAMES REBIDAS, DAVID HUFFMAN,
[first name unknown] HARMON in their
individual capacity; and JOHN DOE
POLICE OFFICERS 1 through 5 in their
individual capacity,

     Defendants.

_____/

Case No.

Hon.

JURY TRIAL DEMANDED

Mark P. Fancher (P56223)
Syeda Davidson (P72801)
Bonsitu Kitaba-Gaviglio (P78822)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6822
mfancher@aclumich.org
sdavidson@aclumich.org
bkitaba@aclumich.org

_____/

## COMPLAINT

## INTRODUCTION

1. Plaintiff Christopher Gibson is an African American man with a mental disability who was brutally battered, tasered and threatened with a barking K-9 while he was detained in a holding cell in the Warren police headquarters.

2. This is an action for damages and declaratory and injunctive relief to remedy Defendants' violations of Plaintiff's rights under the Fourteenth Amendment to the U.S. Constitution, the Rehabilitation Act, and the Americans with Disabilities Act.

3. Before, during and after Plaintiff's admission to the Warren jail, Warren police officers were placed on notice multiple times that Plaintiff was experiencing a mental health emergency and required the intervention and assistance of a mental health professional. Defendants' disregard for requests for professional assistance for Plaintiff ultimately caused Plaintiff to become unjustifiably treated as a danger to police officers, and Defendant officers subjected him to undeserved torture.

4. Such conduct could and should have been prevented by Defendant City of Warren with proper training, policies and supervision and Defendants should be enjoined from engaging in and permitting such conduct.  Plaintiff should also receive compensation for his injuries.

5. This was not an isolated occurrence. The Warren Police Department has a history of physically and otherwise abusing persons they have arrested. These incidents include, among others: a) In 2023 an argument between a Warren police officer and an arrestee who was being fingerprinted and photographed escalated and the officer struck the arrestee multiple times and then slammed his head against the floor[1]; b) It was reported that in 2022 six Warren police officers repeatedly punched and kicked a 17-year-old[2]; c) It was reported that in 2021 four Warren police officers participated in the beating of a 16-year-old who was accused of stealing a catalytic converter.[3] The youth was rendered unconscious by the beating.

6. On December 13, 2022, Plaintiff in this action joined the list of victims of Warren police brutality, and he seeks relief for his injuries.

---

[1] Press Release, U.S. Dep't of Just., *Former Michigan Police Officer Sentenced for Civil Rights Violation for Violently Assaulting Arrestee* (Sep. 10, 2024), https://www.justice.gov/archives/opa/pr/former-michigan-police-officer-sentenced-civil-rights-violation-violently-assaulting (on file with author).
[2] Christina Hall, *Warren Police: Officers Encountered 'Extreme Dangers' from Detroit Teen They Are Accused of Assaulting*, DETROIT FREE PRESS (Oct. 13, 2022), https://www.freep.com/story/news/local/michigan/macomb/2022/10/13/warren-police-officer-suspended-for-punching-teen/69561458007/ (on file with author).
[3] *Lawsuit Filed Against 4 Warren Police Officers Who Allegedly 'Savagely Beat' 16-year-old During Arrest for Catalytic Converter Theft*, WWJ Newsradio 950 (Nov. 22, 2022), https://www.audacy.com/wwjnewsradio/news/local/4-warren-police-officers-accused-of-savagely-beating-teen.

## JURISDICTION AND VENUE

7.  This Court has subject matter jurisdiction over the federal claims raised in this action pursuant to 28 U.S.C. §§ 1331 and 1343.

8.  Plaintiff seeks damages and declaratory and injunctive relief to enforce federal rights under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C § 12132 *et seq*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  Plaintiff also seeks reasonable costs and attorney's fees under 42 U.S.C. § 1988, 29 U.S.C. § 794a, and 42 U.S.C. § 12205.

9.  This Court has jurisdiction to issue declaratory, injunctive, and other relief under 28 U.S.C. §§ 2201 and 2202.

10. Venue is proper in the Eastern District of Michigan, Southern Division pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in the City of Warren, Macomb County, Michigan.

## PARTIES

11. Plaintiff CHRISTOPHER GIBSON was 24 years old when he was arrested and detained in the Warren jail on or around December 13, 2022. Plaintiff has been diagnosed with schizophrenia. Before and during his detention he experienced a mental health emergency that required the intervention of mental health specialists. Professional assistance was denied by Defendants,

4

and they instead unnecessarily assaulted Plaintiff physically and caused him great mental and bodily harm.

12. Defendant CITY OF WARREN is a municipal corporation in Macomb County, Michigan, subject to the laws and Constitution of the United States. Defendant CITY OF WARREN operates, manages, and controls the Warren Police Department. Defendant CITY OF WARREN is a public entity under Title II of the ADA and a program or activity receiving federal financial assistance for purposes of the ADA and Section 504 of the Rehabilitation Act.

13. Defendants STEVEN HODGES, BRENDEN FRASER, DANIEL BRADLEY, JEFFREY MOTYKA, MARK SMITH, THOMAS SCHMELZER, ANTHONY GIANNOLA, ADAM DICKIE, DAVID VILLEROT, JAMES REBIDAS, DAVID HUFFMAN, AND (FIRST NAME UNKNOWN) HARMON are "persons" under 42 U.S.C. § 1983 and agents of the City of Warren and Warren Police Department for the purposes of Title II of the ADA and Section 504 of the Rehabilitation Act. At all times relevant to this complaint, these officers were acting under color of state law. They are sued in their individual capacity.

14. Defendants JOHN DOE POLICE OFFICERS 1 THROUGH 5 are officers with the Warren Police Department who are liable to Plaintiff because of their involvement in the events at issue, but whose identities have not been

5

determined.  They are "persons" under 42 U.S.C. § 1983 and agents of the City of Warren and Warren Police Department for the purposes of Title II of the ADA and Section 504 of the Rehabilitation Act.  At all times relevant to this complaint, these officers were acting under color of state law.  They are sued in their individual capacity.

## FACTS

15. On or about December 12, 2022, Plaintiff visited his mother in Detroit after an emotional night spent with a cousin dying of cancer. Plaintiff has a mental disability, and he began to display symptoms that included: incoherence, manic behavior that included following family members, repetitive rambling, talking to himself, and sitting in a catatonic state.

16. Plaintiff's mother attempted to persuade Plaintiff to go home, but he recognized his own crisis and suggested that he be taken to a mental health facility. When Plaintiff's mother texted the Detroit police to request their assistance in transporting him to the hospital, he became agitated and left the house suddenly.

17. When the Detroit police arrived, they joined Plaintiff's mother in a 10-minute search of the neighborhood that was unsuccessful. Sometime later, and unbeknownst to Plaintiff's mother, persons at a gas station observed Plaintiff and they contacted the Warren Police Department and explained to the police

that they were concerned about Plaintiff. Warren police officers apprehended Plaintiff and explained to him that they were responding to the concerns expressed about him by the gas station personnel.

18. Hours later, Plaintiff's mother noticed she had three missed calls from her son. When she returned the last call at about 3:25 a.m., on December 13, 2022, Warren police officer Kevin Defrain spoke to Plaintiff's mother and advised her that Plaintiff had been arrested by the Warren police for an outstanding warrant for two counts of identity theft. Plaintiff was in the rear of the police vehicle driven by the officer at the time. During that call, Plaintiff's mother explained that Plaintiff was experiencing a mental health emergency and he should be taken to a psychiatric hospital instead of the police station. When her repeated requests for mental health assistance were disregarded by the Warren police officer, she declared her plans to seek assistance from the 911 emergency service and she ended the call.

19. Plaintiff's mother then called the Detroit police for advice. They suggested that she call the Warren police again and request a supervisor. She followed that advice, and the Warren police supervisor said they would keep Plaintiff under observation and if it appeared that he needed mental health services they would provide them.

20. Assured by her conversation with the Warren police supervisor, Plaintiff's mother retired for the evening. However, the next day she was told that her son was not in the Warren jail. For three days, Plaintiff's mother was in the dark about the fate of her son, and in the course of her personal investigation she contacted the Macomb County Jail. She was told Plaintiff had been taken to the hospital for undisclosed reasons.

21. Plaintiff had been taken to McLaren Hospital, where he remained in police custody and was not allowed a visit by his mother. When Plaintiff's mother reached the treating doctor, he asked if her son had any previous problems with his kidney or heart because both organs were leaking. She said there were no such preexisting problems. Plaintiff remained in the hospital for about a week, during which time no mental health services were provided. Plaintiff's mother spoke with Macomb Mental Health Services, which offered to send a mental health professional to attend to Plaintiff, but they too were not allowed to visit Plaintiff.

22. Immediately prior to Plaintiff's hospitalization, and while he was detained in the Warren Police Department's holding cells, he had several encounters with Warren police officers.

23. During one encounter with officers that occurred at or about 8:37 a.m. on December 13, 2022, officers urged Plaintiff to cooperate with their efforts to

take him to an interview room. Plaintiff explained to the officers that his reluctance was due to his mental health emergency. An officer responded by saying: "You're mental, that's fine. You can still follow directions."  During this encounter, the officers engaged with Plaintiff physically and Plaintiff, whose mental state caused him to perceive the officers as a threat to his safety, physically reacted in various ways including biting. An officer pepper sprayed Plaintiff in response, and from that point until Plaintiff was no longer in Defendants' custody, Defendants treated Plaintiff as a threat to officers' safety rather than as an individual in need of psychiatric intervention.

24. Approximately one hour later, Plaintiff had a second encounter with officers when six officers approached Plaintiff's cell stating their need to remove his handcuffs. One of the officers stated: "Did you know there is a camera in the cell and you were bouncing around the cell about 30 seconds ago? We want to give you an opportunity to get those handcuffs off. You will be a lot more comfortable."

25. From the time that Plaintiff was jailed he was under continuing surveillance. In a "Request for Warrant Authorization" an officer wrote: "While in his cell [Gibson] began acting erratic and it was determined he needed to be moved to the segregation cell."

26. Plaintiff was extremely lethargic, and he otherwise displayed signs of his mental illness.

27. Approximately 90 minutes after the second encounter, the named Defendant officers approached Plaintiff's cell. This group included a barking, snapping K-9 and his handler as well as at least one officer carrying a riot shield, and at least one other carrying a taser. They shouted that their mission was to move him to the Macomb County Jail, and that to do that they would need to put him back in handcuffs.

28. Plaintiff continued to exhibit signs of his mental illness and disorientation, and he had great difficulty following the officers' directions. Ultimately, the officers opened the cell door and deployed a taser. Only one of two prongs of the taser attached to Plaintiff's chest area, and when it caused no stun effect, the officers charged at Plaintiff, took him to the floor and pinned Plaintiff to the floor face down. After Plaintiff was fully subdued and immobilized, Defendants administered multiple taser shocks to Plaintiff in drive-stun mode.

29. In the course of the Defendant officers' engagement with Plaintiff, they struck him repeatedly; an officer's knee was placed on Plaintiff's right upper arm; another officer placed himself fully on Plaintiff's body; an officer used an arm lock around Plaintiff's head; and Defendants used various "muscling techniques."

30. During the Defendants' physical assault, Plaintiff shouted: "I'M NOT RESISTING! Take me to the mental hospital now! Please! I'm cooperating! I've got the message!"

31. An officer responded to Plaintiff by shouting: "You ARE resisting! Do not fucking resist anymore! If you keep resisting you will get tased again!"

32. Plaintiff then said: "You've got me! My fucking mental illness is going on! What the fuck?" The officers then lifted Plaintiff and carried him through the cell door. One officer then suggested that they try to have him walk. They stood him up. Plaintiff took a few steps down the corridor and then collapsed. The officers fell on Plaintiff again. Finally, Plaintiff was lifted again.

33. During the period after Plaintiff was extracted from his cell and as he was being prepared for transport to the Macomb County Jail, Defendant officers used additional excessive force in various ways and on various occasions, including the use of pepper spray.

34. Another use of excessive force occurred when Plaintiff was shackled and seated quietly in the back of a police vehicle, but officers nevertheless snatched open the vehicle's door, violently seized Plaintiff and gratuitously and without cause or reason threw him to the asphalt with full force.

35. Plaintiff was transported to the hospital where he was treated for musculoskeletal rhabdomyolysis, acute kidney injury, leukocytosis, and transaminitis.

36. Defendant City of Warren was aware of the need for its officers to receive training that would prepare them to address mental health issues and presumably avoid causing injuries of the kind sustained by Plaintiff. According to the 2021 Warren Police Department Annual Report: "The Training Division leveraged technology to continue their training mission. They were able to conduct Implicit Bias, Ethics, and *Mental Illness training* for the entire department by utilizing on-line training programs."[4] (emphasis added).

37. Because of previous incidents, Defendant City of Warren was aware of the need for its officers to receive training that would prepare them to engage with the public without using excessive force. (See footnote 1.) Defendant City of Warren also had available to it personnel presumably trained to prevent violent encounters, but they were either not utilized during the encounter with Plaintiff, or they lacked adequate training to respond effectively to his circumstances. According to the 2021 Warren Police Department Annual

---

[4] Warren Police Dep't, 2021 Annual Report 48 (2021) (emphasis added), https://www.cityofwarren.org/wp-content/uploads/2022/11/2021-Annual-Report-FINAL_compressed.pdf

Report, the Warren Police Department's crisis negotiator unit received training in conflict resolution, de-escalation, and had as its mission the safe and successful resolution of dangerous situations without violence. Warren Police Dep't, 2021 Annual Report at 58.

### CLAIMS FOR RELIEF

### Count I
### Violation of the Fourteenth Amendment as Enforceable through
### 42 U.S.C. § 1983 for Failure to Provide Medical Care

38. The preceding paragraphs are incorporated by reference as if set forth at length herein.

39. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 alleging failure to provide adequate medical care in violation of the Fourteenth Amendment.

40. Plaintiff is a citizen of the United States.

41. Defendant officers are persons who at all relevant times were acting under the color of state law in their capacity as officers of the Warren Police Department, and their acts or omissions were conducted within the scope of their official duties or employment.

42. At all relevant times, Plaintiff had a right under the Fourteenth Amendment to receive necessary medical care while he was in jail.

43. At all relevant times, Plaintiff's rights were clearly established, and any reasonable police officer would have known, or should have known, of these

rights. *See Estelle v. Gamble*, 429 U.S. 97 (1976); *Clark-Murphy v. Foreback*, 439 F.3d 280 (6th Cir. 2006); *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001).

44. Plaintiff had a professionally diagnosed, objectively serious medical need for which he received ongoing treatment prior to his detention by Defendants, which condition Defendants could have, and should have had verified by mental health professionals, particularly because they were advised of Plaintiff's condition, and they observed conduct consistent with the condition.

45. Plaintiff was a pre-trial detainee entitled to a presumption of innocence, and as such he should not have been subjected to any kind of punitive treatment.

46. Notwithstanding Defendants' failure to seek professional assistance for Plaintiff, the severity of Plaintiff's condition was so obvious that, because of Plaintiff's request for psychiatric intervention and observed erratic behavior, confusion, hyperactivity, lethargy, and other conduct, even a lay person could have, and Defendants should have easily recognized the need for assistance from a mental health professional.

47. Any reasonable officer present at the time and place of Plaintiff's detention would have understood that Plaintiff's need for the assistance of a mental health professional subjected Plaintiff to an excessive risk of harm if for no

reason other than Plaintiff's physically erratic reactions to Defendant officers increased the likelihood of their inclination to use force against Plaintiff.

48. Notwithstanding Defendants' knowledge that their failure to provide Plaintiff with the assistance of mental health professionals posed a substantial risk of serious injury to Plaintiff, Defendants were deliberately indifferent, and they ignored and/or recklessly disregarded that risk and failed to provide Plaintiff with the professional assistance that he needed.

49. Defendants were placed on notice of Plaintiff's need for medical intervention and treatment for the mental health crisis he experienced when they were first called by gas station personnel who expressed concern about Plaintiff's conduct, and the responding officers were able to observe Plaintiff's conduct and otherwise engage with him. Defendants were further placed on notice of Plaintiff's need for psychiatric assistance even before he was detained in the Warren Police Department's holding facility when Plaintiff's mother requested by phone that a Warren police officer take her son to a psychiatric hospital rather than to jail. Plaintiff's mother made the same request of a supervisor. Plaintiff himself advised Warren police officers multiple times of his mental health emergency. Finally, Plaintiff's behavior while he was in jail (i.e., extreme lethargy, pacing, animated behavior, incoherence, confusion,

etc.) were such that the average person, including Defendants, should have known that Plaintiff required professional treatment.

50. Defendants were aware or should have been aware of the substantial risk of serious harm to Plaintiff if his mental health condition was not addressed. Defendants observed and interacted with Plaintiff for an extended period and through a series of encounters learned of Plaintiff's own conclusion that he was experiencing a mental health crisis. Defendants also observed Plaintiff's erratic behavior and officers made comments about that behavior.

51. Defendants were deliberately indifferent, and they ignored and/or recklessly disregarded Plaintiff's medical needs. Rather than arrange for intervention by a mental health professional who could address Plaintiff's crisis and restore him to a mental state that would make it possible for him to peacefully comply with officers' demands and to otherwise cooperate without the use of physical force, Defendants instead were deliberately indifferent, and they ignored and/or recklessly disregarded Plaintiff's circumstances and decided to conduct what could have been a routine jail transfer operation, but which instead involved use of a squadron of officers, a taser, a riot shield, shackles and a barking K-9.

52. Notwithstanding Defendants' knowledge of the substantial risk of serious harm to Plaintiff, Defendants were deliberately indifferent, and they ignored

and/or recklessly disregarded Plaintiff's need for assistance by mental health professionals and failed to provide him with necessary care. They also exacerbated the harm to Plaintiff by confronting him with a show of force and then using extreme violence to force compliance with their orders.

53. As a result of Defendants' failure to provide Plaintiff with necessary medical care, he suffered extreme physical pain and severe physical injuries as well as emotional suffering, psychological injury, and trauma, such treatment being prohibited by the Fourteenth Amendment.

**Count II**
**Violation of the Fourteenth Amendment as Enforceable**
**through 42 U.S.C. § 1983**
**for Excessive Force by Defendant Officers**

54. The preceding paragraphs are incorporated by reference as if set forth at length herein.

55. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 alleging Defendant officers used excessive force against him in violation of the Fourteenth Amendment.

56. Plaintiff is a citizen of the United States.

57. Defendant officers are persons who at all relevant times were acting under the color of state law in their capacity as officers of the Warren Police Department, and their acts or omissions were conducted within the scope of their official duties or employment.

17

58. At all relevant times, Plaintiff had a right under the Fourteenth Amendment to be free from excessive force by law enforcement officers.

59. At all relevant times, Plaintiff's rights were clearly established, and any reasonable police officer would have known, or should have known of these rights. *See*, *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490 (6th Cir. 2012); *Meirthew v. Amore*, 417 F. App'x 494 (6th Cir. 2011); *Griffith v. Coburn*, 473 F.3d 650 (6th Cir. 2007).

60. Defendants' use of force against Plaintiff was objectively unreasonable, disproportional, unjustified and inappropriate under the circumstances that are relevant to his claim.

61. Defendants' use of force was the proximate and direct cause of Plaintiff's physical, emotional, and other injuries.

62. During their encounter with Plaintiff, there was no need for Defendants to employ physical force of any kind. Plaintiff was experiencing a mental health emergency, and if Defendants had provided him with professional assistance, Plaintiff could have, after receiving counseling and the assurance of a professional, peacefully and voluntarily complied with all of Defendants' commands.

63. Because Defendants failed to provide Plaintiff with the professional assistance he needed, his mental health rendered him incapable of complying

with Defendants' directions. Though it was unnecessary to use physical force, Defendants nevertheless, in reckless disregard of Plaintiff's mental health crisis, intentionally and maliciously employed a taser, "muscling techniques," joint locks, hand strikes/blows, restraint by the body weight of multiple officers, compression, and other physical attacks that caused Plaintiff extreme physical pain and severe injuries as well as emotional suffering, psychological injury, and trauma, such treatment amounting to cruel and unusual treatment of a kind prohibited by the Fourteenth Amendment. Defendant officers' use of force on Plaintiff was excessive and objectively unreasonable in that reasonable officers with knowledge of Plaintiff's need for the assistance of mental health professionals would have obtained such assistance as part of an effort to deescalate rather than escalate Plaintiff's anxiety.

64. The use of the taser on Plaintiff was not for purposes of preventing physical harm to Defendants or others, or for preventing Plaintiff's escape, but was purportedly to force Plaintiff's compliance with Defendants' orders. At the time that Defendants used the taser on Plaintiff, he had been fully subdued, and he posed no risk of physical harm to the officers, nor was he resisting physical restraint, nor was he threatening or attempting escape.

65. Force was unnecessary, but to the extent that it was used by Defendants, it was grossly disproportionate to any potential threat posed by Plaintiff.

Plaintiff was confined in a jail cell, unarmed, lethargic and fearful when confronted by the full group of heavily armed Defendant officers and a K-9, all of whom used force against Plaintiff.

66. Defendant officers made no effort to temper or limit the amount of force used. Specifically, Defendants failed to:

- obtain the assistance of a mental health professional;

- speak calmly and use non-threatening body language;

- eliminate sources of over-stimulation;

- avoid use of a K-9;

- seek the assistance of Plaintiff's mother;

- use patience; and

- repeat short, direct phrases in a calm voice.

67. Plaintiff offered no resistance to Defendant officers, and at most Plaintiff manifested the type of confusion and uncertainty generally associated with mental illness. Defendants falsely characterized Plaintiff's inability to cooperate, and the convulsions caused by taser shocks as "resistance," and they used Plaintiff's limitations as a pretext for the use of force.

68. As a result of the physical force employed by Defendants, Plaintiff sustained serious injuries to multiple internal organs as well as other emotional, mental,

and soft tissue injuries that required that Plaintiff be hospitalized for an extended period.

69. Because of Defendants' pattern of use of excessive force on occasions that preceded, and which include the attacks on Plaintiff, there is a likelihood that unless Defendants are enjoined, Plaintiff and others similarly situated will become victims of Defendants' use of excessive force in the future.

**Count III**
**Monell Liability in Violation of 42 U.S.C. § 1983**
**(Against Defendant City of Warren)**

70. The preceding paragraphs are incorporated by reference as if set forth at length herein.

71. Defendants were state actors acting under color of law.

72. Plaintiff's federal constitutional claims are cognizable under 42 U.S.C. § 1983.

73. Plaintiff has been subjected to a deprivation of his constitutionally protected rights and privileges secured by the U.S. Constitution as set forth herein.

74. The deprivations were caused by the City of Warren's deliberate indifference in that it provided inadequate training to Defendant officers; failed to supervise Defendant officers; failed to effectively use resources that could have prevented harm to Plaintiff, and Defendant City of Warren acquiesced in Defendant officers' unconstitutional conduct.

75. Defendant officers were, at all relevant times, employed by the Warren Police Department.

76. Because of previous incidents, Defendant City of Warren was aware of the need for its officers to receive training that would prepare them to engage with the public without using excessive force. (See footnote 1.) Also, according to the 2021 Warren Police Department Annual Report: "The Training Division leveraged technology to continue their training mission. They were able to conduct Implicit Bias, Ethics, and Mental Illness training for the entire department by utilizing on-line training programs."[5] The training provided to Defendant officers was inadequate because the officers' conduct failed to conform to standards of policing that satisfy requirements of federal laws. This training was ineffective as evidenced by Defendant officers' responses and interaction with Plaintiff.

77. Defendant City of Warren had the capacity to provide Plaintiff with the professional mental health assistance he needed but failed to do so, as evidenced by the fact that a supervisory officer advised Plaintiff's mother of such capacity.

78. Defendant City of Warren also had available personnel presumably trained to prevent violent encounters, but they were either not utilized during the

---

[5] *See supra* note 4.

22

encounter with Plaintiff, or they lacked adequate training to respond effectively to his circumstances. According to the 2021 Warren Police Department Annual Report, the Warren Police Department's crisis negotiator unit received training in conflict resolution, de-escalation, and had as its mission the safe and successful resolution of dangerous situations without violence. That objective was not satisfied in Plaintiff's case.

79. Defendant officers should have been trained to respond in the following ways, among others, when a prisoner experienced a mental health emergency:

- obtain the assistance of a mental health professional;

- speak calmly and use non-threatening body language;

- eliminate sources of over-stimulation;

- avoid use of a K-9;

- seek the assistance of relatives;

- use patience; and

- repeat short, direct phrases in a calm voice.

Defendant City of Warren failed to provide Defendant officers with adequate training to take any of these measures, and/or maintained unconstitutional customs, and /or ratified unconstitutional behavior and/or failed to provide the policies, direction or supervision needed for them to do so, and the officers'

acts and omissions were the direct and proximate cause of Plaintiff's serious injuries.

80. Defendant City of Warren's failure to effectively use its resources or provide policies, supervision, direction and adequate training to Defendant police officers amounts to deliberate indifference because Defendant City of Warren was aware, or reasonably should have been aware, that its acts and omissions would result in the violation of Plaintiff's rights.

81. Defendant City of Warren's failure to provide Defendant officers with adequate training and/or Defendant City of Warren's maintenance of unconstitutional customs, and/or ratification of unconstitutional behavior and/or failure to provide the policies, direction or supervision needed to Defendant officers was the moving force and a direct and proximate cause of the injuries suffered by Plaintiff.

**Count IV**
**Disability-Based Failure to Accommodate in**
**Violation of Section 504 of the Rehabilitation Act of 1973**
**(Against Defendant City of Warren)**

82. The preceding paragraphs are incorporated by reference as if set forth at length herein.

83. Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its implementing regulations provide, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his

disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a); *see also* 34 C.F.R. § 104.4(a). Upon information and belief, Defendant City of Warren is a recipient of Federal financial assistance.

84. Among other requirements, entities subject to Section 504 must provide equal opportunity to qualified persons with disabilities to participate or benefit from any aid, benefit, or service they make available. 34 C.F.R. § 104.4(b)(1)(ii).

85. Plaintiff is an "individual with a disability." Under Section 504 an individual with a disability: "has a physical or mental impairment which for such individual constitutes or results in a substantial impediment to employment . . . ." 29 U.S.C. § 705(20).

86. Section 504 further defines an individual with a disability by cross-referencing the Americans with Disabilities Act ("ADA"). 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12102(1)). When using the ADA criteria, a person has a disability under Section 504 if they have a physical or mental impairment that substantially limits one or more of their major life activities. 42 U.S.C. § 12102(1)(A). Plaintiff has been diagnosed with schizophrenia, which is classified as a mental disability under the ADA, as well as under

Section 504. Plaintiff's condition limits his ability to control his thoughts and behavior, which are both major life activities.

87. Under Section 504 and the ADA, a person with a disability who is qualified to receive services is an individual who has a physical or mental impairment that substantially limits one or more major life activities. 29 U.S.C. § 705(20)(B). Such a person is one who, with or without reasonable accommodations for their disability, meets essential eligibility requirements to receive services from or participate in programs or activities of a recipient of federal financial assistance. *See* 29 U.S.C. § 794(a). "Virtually everything" that a jail does is considered a "service, program, or activity" for purposes of Section 504 and the ADA. *See Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998) (quoting 42 U.S.C. § 12132). Plaintiff was a prisoner in the Defendant's detention facility and was therefore fully eligible for its services, including, but not limited to its medical services.

88. At the time that Plaintiff was detained by Defendant he was a qualified individual with a disability.

89. Defendant had the capacity to provide prisoners with psychiatric and other medical services.

90. Defendants were aware of Plaintiff's need for psychiatric services because they received his requests for such services, and they observed Plaintiff's

erratic behavior, confusion, hyperactivity, lethargy, and other conduct that would lead even a lay person to recognize the necessity of a mental health professionals' attention.

91. Plaintiff had a disability, was qualified to receive services, and Defendant was aware of Plaintiff's needs for psychiatric intervention. Defendant intentionally denied Plaintiff psychiatric services solely because of his disability and they were deliberately indifferent to his psychiatric needs.

92. Plaintiff and his mother repeatedly informed Defendants that Plaintiff was experiencing a mental health emergency and required mental healthcare services.

93. Providing Plaintiff with mental healthcare services would not have imposed undue financial or administrative burdens on Defendants, nor would it have fundamentally altered the nature of Defendants' services or programs.

94. Defendants reasonably could have accommodated Plaintiff's psychiatric needs, because not only did they have the capacity to do so, but they also acted on other concerns (e.g., removing Plaintiff's handcuffs to ease discomfort). They nevertheless, and solely because of Plaintiff's disability, intentionally refused to provide psychiatric services and they were deliberately indifferent to his psychiatric needs.

95. As a consequence of Defendants' failure to accommodate Plaintiff's disability, his ability to benefit from the services he requested was impeded.

96. As a proximate cause of these violations of Section 504, Plaintiff has suffered harm as set forth above.

**Count V**
**Disability-Based Failure to Accommodate in**
**Violation of Title II of the Americans With Disabilities Act**
**(Against Defendant City of Warren)**

97. The preceding paragraphs are incorporated by reference as if set forth at length herein.

98. Title II of the ADA and its implementing regulations forbid public entities from excluding or denying people with disabilities the benefits of their services, programs, or activities, or discriminating against them based on disability. 42 U.S.C. § 12132; 28 C.F.R. § 35.104.

99. Prohibited disability-based discrimination by public entities includes the failure to provide qualified individuals with disabilities an equal opportunity to participate in or benefit from aids, benefits, or services, or "otherwise limit" a qualified individual with a disability in the enjoyment of any right, privilege, aid, benefit, or service. 28 C.F.R. § 35.130(b)(1)(ii) & (vii). Prohibited discrimination includes the failure to make reasonable modifications as necessary to avoid discrimination against an individual based on their disability. 28 C.F.R. § 35.130(b)(7).

28

100. Plaintiff is an "individual with a disability." A person has a disability under the ADA if they have a physical or mental impairment that substantially limits one or more of their major life activities. 42 U.S.C. § 12102(1)(A). Plaintiff has been diagnosed with schizophrenia, which is classified as a mental disability under the ADA. Plaintiff's condition limits his ability to control his thoughts and behavior, which are both major life activities.

101. "Virtually everything" that a jail does is considered a "service, program, or activity" for purposes of Section 504 and the ADA. *See Johnson*, 151 F.3d at 569 (6th Cir. 1998) (quoting 42 U.S.C. § 12132*)*. Plaintiff was a prisoner in the Defendants' jail and was therefore fully eligible for its services, including, but not limited to its medical services.

102. Plaintiff was a qualified individual with a disability.

103. Defendant had the capacity to provide prisoners with psychiatric and other medical services as evidenced by the fact that a supervisory officer advised Plaintiff's mother of such capacity.

104. Defendants were aware of Plaintiff's need for psychiatric services because they received his requests for such services, and they observed Plaintiff's erratic behavior, confusion, hyperactivity, lethargy, and other conduct that would lead even a lay person to recognize the necessity of a mental health professionals' attention.

105. Plaintiff had a disability, was qualified to receive services, and Defendants were aware of Plaintiff's needs for psychiatric intervention. But for his disability, Defendants would not have caused Plaintiff to suffer adverse consequences by denying him psychiatric services.

106. Public entities must make reasonable modifications in policies, practices, or procedures when such modifications are necessary to accommodate individuals with disabilities as well as to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130 (b)(7).

107. Plaintiff and his mother repeatedly informed Defendants that Plaintiff was experiencing a mental health emergency and required mental healthcare services.

108. Providing Plaintiff with mental healthcare services would not have imposed undue financial or administrative burdens on Defendants, nor would it have fundamentally altered the nature of Defendants' services or programs.

109. Defendants reasonably could have accommodated Plaintiff's psychiatric needs because they accommodated him in other ways, but they intentionally refused to provide psychiatric services solely because of Plaintiff's disability and they were deliberately indifferent to his psychiatric needs.

110. As a consequence of Defendants' failure to accommodate Plaintiff's disability, his ability to benefit from the services he requested was impeded.

111. As a proximate cause of these violations, Plaintiff has suffered harm as set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a. For a declaration that Defendants' actions, policies, and practices as alleged herein are unlawful;

b. For an order enjoining Defendants from violating the constitutional and other legal rights of Plaintiff and others who are similarly situated;

c. For compensatory damages for Plaintiff's injuries and losses in an amount to be proven at trial;

d. For attorneys' fees and costs of suit pursuant to 42 U.S.C. § 1988 and other applicable authority; and

e. For such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Mark P. Fancher
Mark P. Fancher (P56223)
Syeda Davidson (P72801)
Bonsitu Kitaba-Gaviglio (P78822)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6822
mfancher@aclumich.org

Dated: August 13, 2025                    Attorneys for Plaintiff